## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALEXANDRA LEACH,** | |
| Plaintiff, | |
| v. | Case No. 12-cv-01495 (CRC) |
| **NATIONAL RAILROAD PASSENGER CORPORATION,** | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Alexandra Leach's tenure with Amtrak has been a turbulent one.  As the only female heavy-maintenance mechanic at her facility, she has allegedly endured sexual harassment in the form of vulgar insults, demeaning workplace graffiti, life-threatening mischief, and extreme hostility toward women.  Dissatisfied with Amtrak's response to her complaints, Leach filed an Equal Employment Opportunity Commission ("EEOC") charge and then brought this lawsuit.  Leach alleges that Amtrak violated Title VII of the Civil Rights Act of 1964, specifically 42 U.S.C. § 2000e-2(a)(1), by subjecting her to a hostile work environment, sex discrimination, and retaliation.  She also sues Amtrak in tort for negligent supervision of its employees and intentional infliction of emotional distress.

Leach has moved for summary judgment on her hostile-work-environment and negligent-supervision claims; Amtrak has countered by moving for summary judgment on all five of her claims.  Because adjudicating Leach's hostile-work-environment claim would require a number of significant factual and credibility determinations, the Court will deny both parties' motions as to that issue.  It will also deny Amtrak's motion as to retaliation, because a reasonable jury could credit Leach's account of the controlling facts.  But the Court will grant summary judgment for

Amtrak on the issues of sex discrimination, negligent supervision, and intentional infliction of emotional distress, since no genuine issues of material fact exist with respect to them.

## I.  Background

Leach began working at Amtrak as a coach cleaner in 2007 and later became a heavy-maintenance carman (a train mechanic) in its High Speed Rail Division—the only woman then in such a position at Amtrak's Ivy City, Washington, D.C. location.  Pl.'s Mot. Summ. J. Statement of Undisputed Facts ("SOF") ¶¶ 2–3.  Throughout Leach's employment, Amtrak has maintained a policy prohibiting sex discrimination and sexual harassment.  Id. ¶¶ 5–11; Def.'s Mot. Summ. J. SOF ¶ 9.  Leach alleges that her supervisors and coworkers nonetheless subjected her to near-constant harassment and hostility.  This included a depiction of a woman's breasts and vagina on the wall of her work area; sexually explicit or demeaning graffiti, such as "whore" and "hoe," near her work space and on the elevator; a coworker's drawing a penis and semen next to Leach's mouth in the photo on her identification tag; suggestive photos of women posted to public bulletin boards intended for business communications; routine use of sexually explicit jokes and language, as well as discussions of sexual activity; and verbal and written insults directed specifically at Leach, such as "freak ho" and "bitch."  Pl.'s Mot. Summ. J. SOF ¶¶ 15–34, 43–44.

The alleged harassment also included unwelcome sexual advances and threats of physical harm, such as a coworker "plac[ing] his genitals in her face" when she was bending down to work on a train car; a coworker striking her with his car; and coworkers repeatedly removing her identification tag on the board where carmen indicate that they are working beneath a train, which is designed to prevent death or serious injury.  Id. ¶¶ 12, 36–43.  Leach's supervisor allegedly tolerated these misdeeds because he felt that "this is not a work place for women."  Pl.'s Reply Supp. Pl.'s Mot. Summ. J., Ex. PP at 1.  Leach is not the only one to claim that her workplace fosters a hostile environment:  The only female manager in the facility's High Speed Rail Division

also testified that "it's a hostile environment . . . [f]or women," and "a lot goes on at Amtrak that we're not happy with."  Pl.'s Mot. Summ. J. SOF ¶¶ 35.

Leach has lodged frequent complaints with Amtrak officials throughout the years.  Id. ¶¶ 51–52, 56–57, 60.  Unhappy with Amtrak's responses, she initiated both an EEOC charge and this lawsuit, which was filed in September 2012.  Id. ¶¶ 54–55.  Amtrak notes that Leach filed the EEOC charge just one business day after learning that Amtrak's internal EEO department would investigate her complaint.  Def.'s Mot. Summ. J. at 18–19.  The EEOC charge alleged "weekly harassment and intimidation" as well as retaliation.  Pl.'s Reply Supp. Pl.'s Mot. Summ. J., Ex. PP at 1.  With regard to retaliation, Leach maintains that her position on the morning shift was "abolished" and that she was ultimately relegated to the evening shift—which she considers less professionally and personally desirable despite its identical title, pay, benefits, and job duties—as a result of her complaints, a form of protected activity.  Compl. ¶ 24; Pl.'s Opp'n Def.'s Mot. Summ. J. at 8–9.  Amtrak claims that the official who decided to change the schedule, William Vullo, was unaware of Leach's complaints and did so to improve efficiency by relieving carmen of unnecessary holiday work.  Def.'s Mot. Summ. J. SOF ¶¶ 5–6.  Under the applicable collective-bargaining rules, this elimination of holiday work required Amtrak to repost the positions and award them to the most senior union members who applied.  As a result, Amtrak granted the two affected morning-shift positions to employees with more seniority than Leach.  Id. ¶ 7.

Leach's coworkers and supervisors allegedly shunned and ridiculed her as a result of her complaints, sometimes in ways that suggested they were privy to her deposition testimony.  Compl. ¶ 22; Pl.'s Opp'n Def.'s Mot. Summ. J. at 10 (citing Ex. PP at 5G).  Leach claims to have missed several work days and "frequently secreted herself in the wom[e]n's locker room to cry" as a way of coping with the "stress and anxiety" of her situation.  Pl.'s Mot. Summ. J. SOF ¶ 77, 79.  The work environment left her feeling "humiliated, intimidated, helpless and afraid."  Pl.'s Mot. Summ.

J. at 25.

Amtrak maintains that it investigated all of Leach's complaints but was unable to substantiate them. In each case, all known witnesses (and the alleged perpetrators) denied Leach's account, and Leach allegedly refused to provide further information to assist Amtrak's investigation. Def.'s Opp'n Pl.'s Mot. Summ. J. at 20. Leach presents a vastly different picture: Although she concedes that "some form of investigation of some of [her] complaints was conducted," Pl.'s Mot. Summ. J. at 26, she insists that Amtrak "engaged in a systematic practice of indifference . . . and failed to promptly prevent and correct the [harassing] conduct," Pl.'s Reply Supp. Pl.'s Mot. Summ. J. at 1. Leach also claims that her managers and supervisors regularly failed to report known violations of Amtrak's sexual-harassment policy. Pl.'s Mot. Summary J. ¶¶ 16, 19, 21–23, 25–26, 33–34, 43, 45–46.

## II.      Standard of Review

A party is entitled to summary judgment if the pleadings and other materials in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, [or] interrogatory answers," show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c)(1)(A). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[A] material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on a particular claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" and thus inappropriate for "a judge at summary judgment." Barnett v. PA Consulting Grp., Inc., 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting Pardo–Kronemann v. Donovan, 601 F.3d 599, 604 (D.C. Cir. 2010)). But "[s]elf-serving testimony,"

without more, "does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available." Brooks v. Kerry, No. 10-0646, 2014 WL 1285948, at *8 (D.D.C. March 31, 2014) (quoting Fields v. Office of Johnson, 520 F. Supp. 2d 101, 105 (D.D.C. 2007)).  "Particularly in a case . . . where the non-moving party relies almost entirely upon her own generally corroborated statements in depositions, declarations, and interrogatory responses to create a genuine issue of material fact, the Court must carefully assess . . . whether 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. (quoting Liberty Lobby, 477 U.S. at 248); see also Gen. Elec. Co. v. Jackson, 595 F. Supp. 2d 8, 36 (D.D.C. 2009) (observing that when a "declaration is self-serving and uncorroborated," it is "of little value at the summary judgment stage").

## III.  Analysis

Leach has moved for summary judgment on her hostile-work-environment and negligent-supervision claims.  Amtrak has likewise moved for summary judgment, though on all five of Leach's remaining claims: hostile work environment, negligent supervision, sex discrimination, retaliation, and intentional infliction of emotional distress.  The Court will discuss each issue in turn.

### A.  Hostile Work Environment

#### i.      Administrative Exhaustion

A "Title VII lawsuit following [an] EEOC charge is limited in scope to claims that are like or reasonably related to the allegations of the charge and growing out of such allegations." Craig v. District of Columbia, No. 11-1200, 2014 WL 6656979, at *8 (D.D.C. Nov. 24, 2014) (quoting Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995) (quotation marks omitted)).  "[F]or a charge to be regarded as 'reasonably related' to a filed charge under that doctrine, it must '[a]t a minimum . . . arise from the administrative investigation that can reasonably be expected to follow the charge of

discrimination'" in order to allow the agency to resolve the issue administratively before litigation commences.  Payne v. Salazar, 619 F.3d 56, 65 (D.C. Cir. 2010) (quoting Park, 71 F.3d at 907).

Amtrak argues that Leach did not administratively exhaust her hostile-work-environment claim because her EEOC charge focused mostly on her former supervisor on the morning shift, failed to detail allegations against her evening-shift colleagues and supervisors, and listed October 28, 2011—when she was transferred to the evening shift—as the latest date of discrimination.  Def.'s Mot. Summ. J. at 11.  Leach counters that her EEOC charge placed the agency on notice of the nature of her hostile-workplace claim, as that claim was reasonably related to her EEOC charge.  Pl.'s Reply Supp. Pl.'s Mot. Summ. J. at 19.  As a result, her hostile-workplace allegations ought to have arisen during any resulting administrative investigation, especially since she indicated the "continuing" nature of the harassment in her EEOC charge.  Id. Ex. PP at 1.

Amtrak has advanced an unduly narrow interpretation of the exhaustion requirement for hostile-work-environment claims.  As Leach observes, "the exhaustion requirement on a hostile work environment claim is less stringent" than for stand-alone claims of discrimination and retaliation, as a plaintiff "need only have filed an EEOC complaint alleging some of the claims that comprise the hostile work environment claim."  Nurriddin v. Goldin, 382 F. Supp. 2d 79, 106 n.10 (D.D.C. 2005) (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002)), aff'd sub nom. Nurriddin v. Griffin, 222 F. App'x 5 (D.C. Cir. 2007); see also Ramsey v. Moniz, No. 12-1035, 2014 WL 5778251, at *10 (D.D.C. Nov. 6, 2014) ("The requirement concerning the exhaustion of administrative remedies is less stringent for hostile work environment claims than for discrete claims of discrimination or retaliation claims."); Hyson v. Architect of Capitol, 802 F. Supp. 2d 84, 96 (D.D.C. 2011) (permitting non-exhausted allegations in hostile-work-environment claims, "so long as some allegations were exhausted and all of the allegations together form one hostile environment claim").  While Amtrak is correct that Leach focused mainly on alleged

harassment by her morning-shift supervisor in her EEOC charge, she explicitly noted that the harassment was "ongoing" and that she had continued to suffer harm since being transferred to the evening shift.  Pl.'s Reply Supp. Pl.'s Mot. Summ. J, Ex. PP at 1.  She also emphasized, in the notes attached to the charge, that her "[work] environment became hostile" and that her coworkers (as well as her supervisor) made her feel "intimidated, threatened and nervous at work."  Id. at 5D.

Particularly in light of the relaxed exhaustion standards for such claims, the Court finds that Leach's hostile-workplace claim is "like or reasonably related" to the allegations contained in her EEOC charge.  Park, 71 F.3d at 907.  That charge included at least "some of the claims that comprise the hostile work environment claim," Nurriddin, 382 F. Supp. 2d at 106 n.10, after all, and an administrative inquiry into the work environment at Amtrak's Ivy City facility could have "reasonably be[en] expected to follow" the charge,  Payne, 619 F.3d at 65.  The Court therefore concludes that Leach has administratively exhausted her hostile-work-environment claim.

ii.      Merits Analysis

To prevail on a hostile-work-environment claim, "a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  Courts employ a totality-of-the-circumstances test in evaluating such claims, consulting such factors as "the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  Id. (citing Faragher v. Boca Raton, 524 U.S. 775, 787–88 (1998)).  Mere "casual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs," are insufficient.  Park, 71 F.3d at 906 (citation omitted).

A claim for hostile work environment based specifically on sex must show that (1) the

employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment unreasonably interfered with the employee's work performance and created an intimidating, hostile, or offensive working environment; and (5) the employer may properly be held liable. Davis v. Coastal Int'l Sec., Inc., 275 F.3d 1119, 1122–23 (D.C. Cir. 2002) (citation omitted). Whether an employer may be held liable depends on whether a coworker or supervisor of the plaintiff perpetrated the harassment. If a coworker has done so, then an employer may be liable only "if the employer was negligent with respect to the offensive behavior." Vance v. Ball State Univ., 133 S. Ct. 2434, 2441 (2013) (citing Faragher, 524 U.S. at 789). But when the plaintiff's supervisor is the harassing employee, "an employer may be *vicariously* liable for its employees' creation of a hostile work environment" even without a showing of negligence. Id. (citations omitted).

Amtrak argues that it is entitled to summary judgment on the merits of Leach's hostile-work-environment claim because Leach has not presented admissible evidence to support her claim, demonstrated that the alleged harassment she suffered was based on her sex, proven that the alleged harassment was sufficiently severe and pervasive, or shown that Amtrak was negligent in allowing any harassment by her coworkers to occur. Def.'s Mot. Summ. J. at 13–20. Leach, too, contends that she is entitled to summary judgment on this claim because the record evidence overwhelmingly illustrates that she was subjected to a hostile work environment. Leach has pointed to record evidence supporting each of the five elements of her hostile-work-environment claim: (1) women are a protected class; (2) she was subjected to unwelcome sexual harassment, such as the drawing of a penis with semen on her identification-tag photo; (3) the harassment was based upon sex, as demonstrated by her supervisor's assertion that women did not belong in the heavy-maintenance workplace and her coworkers' frequent use of gendered insults like "bitch" and "ho"; (4) the harassment unreasonably interfered with Leach's performance and created an intimidating

environment, as when a coworker placed his genitals in her face and her identification tag was removed from the bulletin board meant to prevent accidents when mechanics are working under trains; and (5) Amtrak undertook only cursory efforts to investigate or rectify Leach's repeated complaints, such as merely asking employees whether they had done what Leach alleged and dropping the matter when they denied it.  Pl.'s Mot. Summ. J. at 21–26.  Based on this evidence, the Court is convinced that a reasonable juror could find that Leach suffered severe and pervasive harms that differ substantially from "ordinary [workplace] tribulations."  Brooks v. Grundmann, 748 F.3d 1273, 1277 (D.C. Cir. 2014) (citation omitted).

Yet Amtrak raises genuine issues of material fact regarding at least one element of Leach's hostile-work-environment claim—namely, whether it, as Leach's employer, is subject to liability—that could persuade a reasonable jury to side against Leach.  As Amtrak notes, none of the harassment Leach allegedly suffered at the hands of supervisors culminated in a tangible employment action, defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Vance, 133 S. Ct. at 2442 (citation omitted).  Thus, under the relevant doctrine, Amtrak can avoid *respondeat superior* liability as to her supervisors' conduct by establishing a so-called Faragher/Ellerth defense, which requires proof that "(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided."  Id. at 2439 (citing Faragher, 524 U.S. at 807; Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)).  And Amtrak cannot be liable for harassment by Leach's *coworkers* if it exercised reasonable care to prevent and correct any such behavior.  See Vance, 133 S. Ct. at 2441.  Amtrak raises both of these defenses, citing its "robust" anti-harassment policy and claiming that it investigated each of Leach's internal complaints, taking corrective action where

necessary.  Def.'s Mot. Summ. J. at 18–19.  Moreover, Leach allegedly refused to participate in these efforts, as evidenced by her decision to file an EEOC charge just one business day after learning that Amtrak's EEO department would review her allegations.  Id.  The Court is satisfied that resolving this dispute would require factual and credibility determinations—regarding the extent of Amtrak's investigations, its corrective actions, and Leach's cooperation—that are inappropriate for summary judgment.

Similarly, genuine issues of material fact exist to defeat Amtrak's Cross-Motion for Summary Judgment on this claim.  For example, Amtrak attempts to downplay the testimony of one of Leach's coworkers (by noting that he was Leach's boyfriend) and of Leach's "paid" union representative (by noting his duty to represent her and his apparent dislike of Leach's morning-shift supervisor).  Def.'s Mot. Summ. J. SOF ¶ 15; Def.'s Repl. Supp. Def.'s Mot. Summ. J. at 22.  But these are precisely the sort of credibility determinations that must be left to a jury.  Moreover, in arguing that Leach's hostile-work-environment claim fails as a matter of law, Amtrak disputes the frequency and severity of her factual allegations, Def.'s Mot. Summ. J. at 15–17, which she nonetheless supports with citations to the record.  Amtrak also argues that Leach's behavior at her deposition—specifically, her decision to consult written notes before answering many questions— undercuts her trustworthiness.  Id. at 13.  The Court cannot engage in such "weighing of the evidence" or "drawing of legitimate inferences" at the summary-judgment stage.  Barnett, 715 F.3d at 358 (quoting Pardo–Kronemann, 601 F.3d at 604).

For all of the above reasons, the Court will deny both parties' motions on Leach's hostile-work-environment claim.

### B.  Negligent Supervision

Both parties have also moved for summary judgment on the issue of whether Amtrak negligently supervised its employees at the Ivy City facility.  The elements of a negligent-

supervision claim in the District of Columbia are that "(1) the employee behaved in a dangerous or otherwise incompetent manner, (2) the employer knew or should have known [of] its employee's dangerous or incompetent behavior and (3) the employer, 'armed with that actual or constructive knowledge, failed to adequately supervise the employee.'"  Busby v. Capital One, N.A., 772 F. Supp. 2d 268, 284 (D.D.C. 2011) (citation omitted) (quoting Brown v. Argenbright Sec., Inc., 782 A.2d 752, 760 (D.C. 2001)).

Yet as Amtrak observes, courts routinely dismiss negligence claims where "the conduct giving rise to [a] plaintiff's negligence claims is the same conduct giving rise to her Title VII claims."  Brown v. Children's Nat'l. Med. Ctr., 773 F. Supp. 2d 125, 138 (D.D.C. 2011); see also Wade v. Wash. Metro. Area Transit Auth., No. 01-0334, 2005 WL 1513137, at *6 (D.D.C. June 27, 2005) (granting summary judgment for defendant on a claim of negligently failing to ensure that "sexual harassment policies were not violated, and more specifically, to assure that Plaintiff was not subjected to a hostile work environment," because the claim was "preempted by Title VII as the injury arises out of the alleged harassment itself").  Here, Leach does not deny that the same *conduct* underpins both her hostile-work-environment and negligent-supervision claims, but instead argues that the *underlying legal theory* for the negligent-supervision claim is different, given that some of the behavior Leach suffered could also constitute assault and battery or intentional infliction of emotional distress.  Pl.'s Reply Supp. Pl.'s Mot. Summ. J. at 20–21.  The Court finds this distinction immaterial.  Because the same facts underlie Leach's negligent-supervision and hostile-work-environment claims, the Court will deny Leach's Motion for Partial Summary Judgment on this issue and grant Amtrak's Motion for Summary Judgment as to Leach's negligent-supervision claim.

C. <u>Sex Discrimination</u>

A sex-discrimination claim under Title VII has two essential elements: that "(i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . sex." <u>Baloch</u>, 550 F.3d at 1196; <u>accord</u> <u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d 490, 493 (D.C. Cir. 2008).  For purposes of this claim, an "adverse employment action" is "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'"  <u>Baird v. Gotbaum</u> (<u>Baird I</u>), 662 F.3d 1246, 1248 (D.C. Cir. 2011) (quoting <u>Douglas v. Donovan</u>, 559 F.3d 549, 552 (D.C. Cir. 2009)).  Leach contends that her transfer from the morning to the evening shift constitutes an adverse employment action under this definition.  But such a "lateral transfer, without more, does not constitute an adverse employment action" for purposes of a discrimination claim, particularly since her title, pay, benefits, and job duties remained the same.  <u>Jones v. D.C. Dep't of Corr.</u>, 429 F.3d 276, 281 (D.C. Cir. 2005).  "[T]he fact that [Leach] suffered subjective harm is insufficient on its own." <u>Baird v. Gotbaum</u> (<u>Baird II</u>), 792 F.3d 166, 172 (D.C. Cir. 2015).  Her perception that the morning shift provided more-fulfilling work opportunities therefore does not expose Amtrak to Title VII liability.  Nor does Amtrak's alleged refusal to permit her to park in the same highly coveted parking spaces as some of her white, male coworkers, Pl.'s Opp'n Def.'s Mot. Summ. J. at 7, amount to a "significant change in employment status."  <u>Baird I</u>, 662 F.3d at 1248.  The Court will therefore grant Amtrak's Motion for Summary Judgment on this issue.

D. <u>Retaliation</u>

To prevail on a Title VII retaliation claim, a plaintiff must show that "(1) [s]he engaged in protected activity; (2) [s]he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." <u>Baird II</u>, 792 F.3d at 168 (quoting <u>Hairston v. Vance-Cooks</u>, 773 F.3d 266, 275 (D.C. Cir. 2014)).  Filing an EEOC

complaint, of course, constitutes protected activity.  See Hamilton v. Geithner, 666 F.3d 1344, 1357 (D.C. Cir. 2012).  Unlike in the general discrimination context, a Title VII retaliation claim *may* be predicated on the subjective reactions of a reasonable worker:  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  The Supreme Court also recently held that in retaliation suits under Title VII, a plaintiff must show that the employer's "desire to retaliate was the but-for cause of the challenged employment action."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013).  Once a defendant demonstrates a nondiscriminatory justification for the adverse action, "a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and [plaintiff's] evidence of retaliation."  Gaujacq v. EDF, Inc., 601 F.3d 565, 577 (D.C. Cir. 2010) (quoting Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009)).

The parties focus primarily on whether transferring Leach to the evening shift could constitute retaliation.  Amtrak argues that Leach's retaliation claim fails as a matter of law because she has suffered no materially adverse action, she has provided no evidence that she had previously engaged in a protected activity, and there is no evidence that the official responsible for changing the schedule—Mr. Vullo—was aware that Leach had complained about her morning-shift supervisor.  Def.'s Mot. Summ. J. at 8–9.  Leach counters that Amtrak ignores the broader Burlington standard for what constitutes an "adverse employment action" in the retaliation context and that she did complain to Vullo about both the allegedly hostile environment and sexist comments by her direct supervisor before her morning shift was "abolished."  Pl.'s Opp'n Def.'s

Mot. Summ. J. at 15–16.  She points mainly to her prior sworn statements to support this account.

Id. at 4.  But Leach's own deposition testimony is too thin a reed to carry the weight of this claim in

light of her burden to rebut Amtrak's nondiscriminatory justification—efficiency and fewer holiday

workdays—for the adverse action.

The Court will not grant summary judgment to Amtrak on the retaliation claim, however,

because Leach has proffered a plausible alternative theory of retaliation.  Leach alleged in her

EEOC intake submission that one of her supervisors warned a coworker to watch what he said

around Leach because "she might 'take [him] upstairs for sexual harassment.'"  Pl.'s Opp'n Def.'s

Mot. Summ. J. at 10 (citing Ex. PP at 5G).  In her complaint, too, she claimed that this supervisor

told other coworkers to "limit their interaction" with her due to her sex-discrimination and hostile-

work-environment complaints.  Compl. ¶ 22.  As a result, her coworkers "began to exhibit hostile

behavior towards her and began to exclude her from work activities."  Id.  A reasonable jury could

conclude that her supervisor's cautionary instructions "might have dissuaded a reasonable worker

from making or supporting a charge of discrimination," Burlington, 548 U.S. at 68, and that the

supervisor would not have warned Leach's colleagues in this way unless he had desired to retaliate

against her, see Nassar, 133 S. Ct. at 2528.  Nor has Leach's account gone uncorroborated:  Her

coworker Jay Calica testified that other Amtrak employees played intimidating music over the

intercom and made police sounds in her presence after she filed her complaint.  Pl.'s Opp'n Def.'s

Mot. Summ. J. at 10–11 (citing Ex. J at 59–60).  The record evidence, then, raises a genuine issue

of material fact as to Leach's retaliation claim.  The Court will deny Amtrak's Motion for Summary

Judgment on this issue.

### E.   Intentional Infliction of Emotional Distress

In the District of Columbia, "the tort of intentional infliction of emotional distress requires

(1) extreme and outrageous conduct by the defendant that (2) intentionally or recklessly (3) causes

the plaintiff severe emotional distress." Garay v. Liriano, 943 F. Supp. 2d 1, 23 (D.D.C. 2013) (quoting Busby v. Capital One, N.A., 932 F. Supp. 2d 114, 148 (D.D.C. 2013)) (internal quotation mark omitted).  This standard is extremely demanding:  For a plaintiff to prevail, the Court must deem the conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Id. (quoting Sere v. Grp. Hospitalization, Inc., 443 A.2d 33, 37 (D.C. 1982)) (internal quotation marks omitted).  "[I]n general, 'employer-employee conflicts do not rise to the level of outrageous conduct'" in the District of Columbia.  McCaskill v. Gallaudet Univ., 36 F. Supp. 3d 145, 160 (D.D.C. 2014) (citing Duncan v. Children's Nat'l Med. Ctr., 702 A.2d 207, 211–12 (D.C. 1997)).  "This is especially true," moreover, "when the alleged intentional infliction arises out of an employer's failure to respond to an employee's personnel complaints."  Id. (citing King v. Kidd, 640 A.2d 656, 670–74 (D.C. 1993)).  Leach expresses dissatisfaction with Amtrak's response to her myriad complaints, but she acknowledges that Amtrak at least cursorily investigated them.  Pl.'s Mot. for Summ. J. at 26.  This employer–employee conflict—emanating from an employer's failure to respond to personnel complaints—does not qualify as intentional infliction of emotional distress under District of Columbia law.  The Court will accordingly grant Amtrak's Motion for Summary Judgment with respect to this issue.

## IV.    Conclusion

For the foregoing reasons, the Court will deny Plaintiff's Motion for Partial Summary Judgment.  It will also grant in part and deny in part Defendant's Motion for Summary Judgment, allowing only Leach's hostile-work-environment and retaliation claims to proceed.  An appropriate order accompanies this memorandum opinion.

_____

CHRISTOPHER R. COOPER
United States District Judge

Date:   September 3, 2015